**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

_____

In re REFCO, INC. SECURITIES          :          07 MDL No. 1902 (GEL)
  LITIGATION                                    :
                                         :
_____:
                                         :
GEORGE L. MILLER, Chapter 7 Trustee :
for the Estate of Suffolk, LLC,          :
                                         :          REPORT AND RECOMMENDATION
          Plaintiff          :          OF THE SPECIAL MASTER
                                         :
      v.          :
                                         :
CSFB,          :          Index No. 09 Civ. 2885 (GEL)
LAB MORGAN CORPORATION,          :          Index No. 09 Civ. 2920 (GEL)
ML IBK POSITIONS, INC.,          :          Index No. 09 Civ. 2922 (GEL)
                                         :
         Defendants          :
_____:

Daniel J. Capra, Special Master

       This is a report and recommendation to Hon. Jed S. Rakoff concerning motions brought by the defendants (collectively, the "Bank Defendants") to dismiss the complaints filed against each by George Miller as Trustee for the Estate of Suffolk LLC ("Suffolk").[1] The Complaint seeks to avoid transfers of funds to the Bank Defendants as part of a transaction in which Suffolk acquired stock of PlusFunds Group, Inc. ("PlusFunds"). According to the Complaint the PlusFunds shares were worth far less than the amount paid by Suffolk for those shares. Complaint ¶ 1. The purchase of the PlusFunds shares was essentially funded by a loan of $204 million made to Suffolk by Refco Capital LLC ("Refco"). Complaint ¶8.

       The facts surrounding the fall of Refco have been recounted in a number of opinions by Judge Lynch. See, e.g., _Kirschner v. Grant Thornton,_ 2009 WL 996417 (S.D.N.Y. Apr. 14, 2009). To the extent necessary for background on the instant motions, familiarity with the financial schemes of Refco is presumed.

_____

      [1] The Plaintiff filed a complaint against each defendant. As the complaints are identical for purposes of this motion, they are referred to collectively as the Complaint.

1

The Complaint alleges that Suffolk was created in order to purchase the shares of PlusFunds, an investment advisor that offered investment vehicles to qualified investors, including the SPhinX family of hedge funds; that the purchase of PlusFunds shares was funded in large part by a loan of $204 million made to Suffolk by Refco; that Suffolk was thinly capitalized; and that Suffolk's principal assets after the purchase of PlusFunds shares was the shares themselves. Complaint ¶ 30-32. The Complaint alleges that the PlusFunds Shares were "of little or no value" and that because Suffolk had no assets of its own "and funded the PlusFunds Tender Offer with money it borrowed from (and owed to) Refco, Suffolk rendered itself insolvent." Complaint ¶ 35.

Refco filed an involuntary petition against Suffolk, for relief under chapter 7 of the Bankruptcy Code, on March 16, 2007; the Bankruptcy Court for the District of Delaware entered an order for relief on April 11, 2007, and the Plantiff was appointed Trustee on April 17, 2007. Complain ¶¶ 11-13.

Plaintiff brings four counts for relief:

• Count 1 alleges a constructive fraudulent transfer and seeks avoidance under Sections 548(a)(1)(B) and 550 of the Bankruptcy Code.

• Count 2 alleges actual fraud in the transfer and seeks avoidance under Sections 548(1)(1)(A) and 550 of the Bankruptcy Code.

• Count 3 seeks avoidance under New York law, pursuant to Section 544(b) of the Bankruptcy Code and New York Debtor Creditor Law §270 et. seq.

• Count 4 seeks recovery for unjust enrichment.

### As further developed and explained below, the Special Master makes the following recommendations with respect to the four counts:

• Counts 1 and 3 should be *dismissed with prejudice*. The purchase of PlusFunds shares is protected from the trustee's avoidance powers by the "safe harbor" for settlement payments under 11 U.S.C. § 546(e).

• The safe harbor provision does not apply to Count 2, which alleges actual fraud. The Plaintiff's claim of fraud is, however, thinly pleaded in a number of material respects, leaving questions about:

— whether there is any legitimate creditor who would benefit from the claim.

— whether Suffolk was anything more than a conduit for the sale of PlusFunds

2

shares.

— whether the purchase of PlusFunds shares was a fraudulent transaction.

The Plaintiff must make a plausible showing on each of the above factors to survive a motion to dismiss. The Plaintiff has not pleaded sufficient facts to make a plausible showing that there is a legitimate creditor, or that Suffolk was more than a conduit. The question is closer on whether the Plaintiff has pleaded sufficient facts to make a showing that the purchase of PlusFunds shares was a fraudulent transaction. However, because leave to amend should be liberally granted, I recommend that Plaintiff be given such leave in order — if possible — to identify, with a specific factual basis, the existence of a legitimate creditor; the control that Suffolk had over the proceeds of the loan and the purchase of the PlusFunds shares; and the facts supporting an inference that the transaction was done with the intent to defraud a creditor of Suffolk.

• Plaintiff has abandoned Count 4, the unjust enrichment claim, subject to a concession from the Bank Defendants that an actual contract governed the Tender Offer for the PlusFunds shares. The Bank Defendants have so conceded for the purposes of this action.[2] Therefore the unjust enrichment claim must be dismissed with prejudice.

---

[2] The Plaintiff's abandonment of the unjust enrichment claim, subject to the Bank Defendants' concession that a contract governed the purchase of the PlusFunds shares, is found in Plaintiff's Memorandum of Law in Response to Defendants' Motion to Dismiss the Complaint at 45. The Bank Defendants' concession on the contract point is found in the transcript of oral argument on the motion to dismiss at 16-17:

PROFESSOR CAPRA: Plaintiff's Memorandum of Law * * * says "The trustee's willing to waive this count * * * if the Bank Defendants do not challenge the issue of whether an actual contract governs the tender offer." Are you challenging that issue?

MR. ANKER: We do not deny that there was a contract * * * .Obviously, unjust enrichment doesn't exist as a matter of State law in any event where there is a contract. Here there was a purchase and sale agreement. * * *

PROFESSOR CAPRA: * * * . So you're not challenging the issue of whether an actual contract governs [the] tender offer; is that right?

MR. ANKER: I acknowledge that there was a contract that governs the tender offer.

## Discussion

### *I. Counts 1 and 3 and the Safe Harbor Provision:*

Section 546 of the Bankruptcy Code — entitled "Limitations on Avoiding Powers" — provides in subsection (e) for a safe harbor protecting certain transfers from a trustee's avoiding powers. Subsection (e) in pertinent part provides as follows:

> Notwithstanding sections 544, 545, 547, 548(a)(1)(B), and 548(b) of this title, the trustee may not avoid a transfer that is a * * * settlement payment, as defined in section 101 or741 of this title, made by or to (or for the benefit of) a * * * financial institution * * *, or that is a transfer made by or to (or for the benefit of) a commodity broker, forward contract merchant, stockbroker, financial institution, financial participant, or securities clearing agency, in connection with a securities contract, as defined in section 741(7), * * * , that is made before the commencement of the case, except under section 548(a)(1)(A) of this title.

Congress enacted section 546(e) "to minimize the displacement caused in the commodities and securities market in the event of a major bankruptcy affecting those industries." H.R.Rep. No. 97-420, 97th Cong., 2d Sess. 1 (1982), U.S.Code Cong. & Admin.News 583. Congress also sought to promote customer confidence in markets by protecting market stability. *Kaiser Steel Corp. v. Charles Schwab & Co.*, 913 F.2d 846, 849 (10th Cir.1990).

The Bank Defendants argue that each transfer the Plaintiff seeks to avoid under Counts 1 and 3[3] is a "settlement payment"[4] by a "financial institution."

---

[3] The safe harbor is by its terms not applicable to the Plaintiff's Count 2, for actual fraud, as that claim is brought under Section 548(a)(1)(A) of the Bankruptcy Code — a section specifically excepted from the coverage of Section 546(e).

[4] As an alternative to the argument that the transaction involved a "settlement payment" the Bank Defendants contend that the transfer was made "in connection with a securities contract." The phrase "in connection with a securities contract" was added by Congress in 2006. See Financial Netting Improvements Act of 2006. The term "securities contract" is broadly defined in Section 741(7) — a definition that clearly covers the purchase of the PlusFunds shares. So there is a strong argument that under the plain meaning of its text, Section 546(e) provides a safe harbor for a purchase of PlusFunds shares because it was a transfer in connection with a securities contract.(The question of whether there was involvement of a "financial institution" is discussed in text below).

But neither the parties nor the Special Master have found case law that has interpreted or applied the "securities contract" language. It is, in the end, unnecessary to decide whether the language covers the purchase of PlusFunds shares because, as discussed below, each transaction is within the safe harbor because it is a "settlement payment."

4

The Plaintiff argues that the safe harbor does not apply for two reasons: 1) the transaction for the PlusFunds shares was not a "settlement payment"; 2) the Bank of New York, which served as the agent for the transaction, was not operating as a "financial institution." These arguments will be discussed in turn.

### A. Settlement Payment

Settlement payments are defined tautologically in Section 741(8) of the Bankruptcy Code as follows:

> * * * a preliminary settlement payment, a partial settlement payment, an interim settlement payment, a settlement payment on account, a final settlement payment, a net settlement payment, or any other similar settlement payment commonly used in the securities trade.

The Plaintiff argues that the transaction sought to be avoided did not involve a settlement payment within the above definition, for two reasons: 1) It was a private transaction and the definition is intended to cover only public transactions; 2) it was not a transaction "commonly used in the security trade." Each of these sub-arguments will be discussed in turn.

### 1. Private Transactions as Settlement Payments

The Plaintiff contends that the safe harbor (and the definition of settlement payment) was never meant to shield payments in private transactions from avoidance actions. He relies on the legislative history of Section 546(e), and the discussion of that history by the Bankruptcy Appellate Panel of the Ninth Circuit in *Kipperman v. Circle Trust F.B.O. (In re Grafton Partners, L.P.)*, 321 B.R. 527, 538 (B.A.P. 9th Cir. 2005). The *Grafton* court noted that the safe harbor provision was intended to protect clearance and settlement systems from the disruption that would occur when public securities transactions are unwound because of the bankruptcy of any one party in the chain. See *Grafton* at 536 ("The protection of settlement payments on securities trades responded to the concerns of the SEC and entities administering the market sales process that the bankruptcy of one firm in the clearance and settlement chain could produce a ripple effect that threatens other parties in the chain.").

The legislative history argument is not dispositive, however, for at least two reasons. First, nothing in the legislative history indicates that Congress intended to limit the safe harbor protection to public trades only. Put another way, while Congress may have been predominately concerned about public transactions, there is nothing to indicate that Congress affirmatively intended to *exclude* private transactions from the safe harbor. Second, and more importantly, there is nothing in the *text* of the rule — either in Section 546(e) or in the definition of settlement payments in Section 741(8) — that excludes private transactions from the safe harbor. Both rules are broadly stated, and the word "public" is nowhere to be found.

Certainly Congress was aware of the frequent occurrence of private transactions, and that an

entity in the clearance and settlement chain of a private transaction may at some point become insolvent. If Congress thought it less important — or not important at all — that private transactions would be subject to unwinding by a bankruptcy trustee, then it could have provided an exclusion from the safe harbor for private transactions. In this context, the textual silence is deafening.

Recent opinions by the Sixth and Eighth Circuits flatly reject the Plaintiff's argument that the safe harbor does not apply to private transactions. These cases rely on the plain meaning of the rule. In *Quality Stores, Inc. v. Alford, (In re QSI Holdings, Inc.)*, 571 F.3d 545, 547-8 (8th Cir. 2009), the court reviewed the text of Section 546(e) and concluded that "nothing in the statutory language indicates that Congress sought to limit that protection to publicly traded securities" It also noted that the transaction at issue (involving a leveraged buyout of more than $100 million) was not insignificant: "The value of the privately held securities at issue is substantial and there is no reason to think that unwinding that settlement would have any less of an impact on financial markets than publicly traded securities." Id. at 550. Certainly the same can be said of the substantial transaction that the Plaintiff seeks to avoid in this case.

Similarly, in *Contemporary Indus. Corp. v. Frost*, 564 F.3d 981 (8th Cir. 2009), the court considered whether the safe harbor applied to a private sale of securities. The court relied on the plain text of the rule:

> To resolve these questions of statutory interpretation, we begin, as always, by looking to the relevant statutory text. *Lamie v. United States Trustee*, 540 U.S. 526, 534, 124 S. Ct. 1023, 157 L. Ed. 2d 1024 (2004). Where statutory language is plain, "the sole function of the courts--at least where the disposition required by the text is not absurd--is to enforce it according to its terms." Id. (quotation omitted). Thus, if the relevant text is not reasonably susceptible to more than one interpretation, we will not look beyond it unless application of the plain language "will produce a result demonstrably at odds with the intentions of its drafters." United States v. Ron Pair Enters., 489 U.S. 235, 242, 109 S. Ct. 1026, 103 L. Ed. 2d 290 (1989) (quotation omitted).

Id. at 984-5.

The *Contemporary Industries* court reviewed the text of Section 546(e) in the following passage:

> Here, the relevant text has a sufficiently plain and unambiguous meaning. We agree with our sister circuits that § 741(8) was intended to sweep broadly. *In re Resorts, Int'l, Inc.*, 181 F.3d at 515-16; *In re Comark*, 971 F.2d at 326; *Kaiser Steel Corp.*, 913 F.2d at 848-49. Thus, we conclude the term "settlement payment," as used therein, encompasses most transfers of money or securities made to complete a securities transaction. *See In re Resorts, Int'l, Inc.*, 181 F.3d at 515-16. That is exactly what we have before us: the payments at issue were transfers of money made to complete a securities transaction, namely, the sale of the Frosts' Contemporary Industries stock. Nothing in the relevant statutory language suggests

Congress intended to exclude these payments from the statutory definition of "settlement payment" simply because the stock at issue was privately held. Section 741(8) is certainly not expressly limited to public securities transactions, and neither is § 546(e).

The recent cases from the Sixth and Eighth Circuits are most persuasive interpretations of the statutory text of "settlement payments" and require the rejection of the Plaintiff's argument that the safe harbor does not apply to private transactions.

## 2. Commonly Used in the Securities Trade

The Plaintiff argues that the purchase of PlusFunds shares was not the kind of transaction "commonly used in the securities trade" and therefore does not fit the statutory definition of a settlement payment provided in Section 741(8). According to the Plaintiff the transaction was not one of common use because "the Bank Defendants were paid an excessive amount of money relative to the value of the PlusFunds shares as part of a scheme in which the Suffolk Insiders cashed out their interests in the essentially worthless PlusFunds stock by conducting a tender offer for the shares at a fraudulently-inflated value."[5] So the contention is that a transaction is not "commonly used in the securities trade" if its underlying facts (or the motives of the actors) indicate illegal or manipulative activity.

The Plaintiff's interpretation of "commonly used in the securities trade" is questionable on a number of counts. First, as a matter of statutory construction: The phrase "or any other similar settlement payment commonly used in the securities trade" is a catch-all provision at the end of the Section 741(8) definition. It is set off by a comma from the other described settlement payments — including a "final settlement payment" which covers the transaction for the purchase of PlusFunds shares. There is no indication that the phrase "commonly used" is intended to modify "final settlement payment." Rather it simply describes the catch-all — "any other similar payment commonly used in the securities trade." Notably, the Sixth and Eight Circuits have both recently held that the phrase "any other similar payment commonly used in the securities trade" does not qualify the other types of settlement payments described in the statutory definition. Rather, it is "a catchall phrase intended to underscore the *breadth* of the §546(e) exemption." *In re QSI Holdings, Inc.*, *supra*, 571 F.3d at 550 (emphasis in original); *Contemporary Industries, supra,* 564 F.3d at 896 ("the phrase follows a long list of various kinds of settlement payments and so we think it is most naturally read as a catchall phrase intended to underscore the breadth of the § 546(e) exemption.").

Section 741(8) therefore cannot be read to impose a "commonly used" limitation on a final settlement payment. But even if it could, the term "commonly used" must, in context, be referring to the *mechanics* of the transaction — not its underlying fairness. Looking to the fraudulent nature of the transaction and thus exempting fraudulent transfers from the safe harbor would make no sense because, as all parties agree (and as the statute provides) the safe harbor is not even applicable to

---

[5] Plaintiff's Memorandum of Law in Response to Defendants' Motion to Dismiss the Complaint 33.

transactions that are actual fraudulent transfers. There would be no need to establish an exception for what is already excepted from the safe harbor.

The only sensible interpretation of the phrase "or any other similar payment commonly used in the securities trade" is that it covers any payment 1) similar to the other settlement payments described in the text that was 2) effectuated with commonly used *procedures*. The Plaintiff does not argue that there was anything at all uncommon about the mechanics employed in the purchase of the PlusFunds shares.

Accordingly, the Plaintiff's argument that the purchase of PlusFunds shares is not subject to the safe harbor because it was a transaction not "commonly used in the securities trade" must be rejected for at least two reasons: 1) the language is not even applicable to the transaction; and 2) even if it were, the procedures used for the PlusFunds transaction were quite common in the securities trade.

### B. Bank of New York as a "Financial Institution"

Section 546(e) provides the safe harbor for settlement payments "made by or to (or for the benefit of) a * * * financial institution." The Plaintiff argues that there was no entity operating as a "financial institution" in the purchase of PlusFunds shares, because the institution that handled the transaction — the Bank of New York — was operating only as a conduit. According to the Plaintiff: "Upon receipt of stock certificates, the BONY sent payments for the account of Suffolk to the tendering stockholders who sent the certificates."[6]

The Plaintiff contends that if the safe harbor applies to transactions where the financial institution operates only as a conduit, Section 546(e) would protect from avoidance every transaction except those few that are directly between the parties on a cash basis. The Plaintiff contends that covering such conduit transactions would make the safe harbor the exception that would swallow the rule of avoidance. The Plaintiff further argues that because BONY provided no guarantees and took on no risk, the policy of the safe harbor — to protect against the unwinding of transactions that would expose securities clearing agencies if any entity in the chain became insolvent — is not applicable.

_____

[6] Plaintiff's Memorandum of Law in Response to Defendants' Motion to Dismiss the Complaint 34.

There is a mild dispute between the parties on whether BONY might have had a more active or complicated role in the transaction, but any dispute of fact need not be resolved. Accepting the Plaintiff's assertion of BONY's role, this motion is best resolved on a legal question: whether an entity that operates as a conduit for a sale of shares is within the legal definition of "financial institution" under Section 546(e).

The Plaintiff relies principally on *Munford v. Valuation Research Corp. (In re Munford)*, 98 F.3d 604, 610 (11th Cir. 1996). There the court found that the bank that was an intermediary in a purchase of shares for a leveraged buyout did not operate as a "financial institution" within the meaning of the safe harbor because "the bank here was nothing more than an intermediary or conduit. Funds were deposited with the bank and when the bank received the shares from the selling shareholders, it sent funds to them in exchange. The bank never acquired a beneficial interest in either the funds or the shares."

More recent cases from other circuits have, however, rejected the *Munford* analysis. Thus, in *Contemporary Industries, supra,* the court found that the safe harbor covered a transfer much like the one in this case — a purchase of securities in which a bank acted only as an intermediary to transfer the funds. The court relied on the plain meaning of the term "financial institution" — and criticized *Munford* — in the following passage:

> We further conclude the payments were made "by or to a . . . financial institution" within the plain meaning of § 546(e). * * * CIC contends this requirement is not satisfied because First National never obtained a beneficial interest in the payments made to the Frosts. We recognize that a divided panel of the Eleventh Circuit adopted this argument in refusing to apply § 546(e) to protect similar payments made to selling shareholders in the course of a leveraged buyout. *Munford v. Valuation Research Corp. (In re Munford, Inc.)*, 98 F.3d 604, 610 (11th Cir. 1996) (per curiam). Because the bank never obtained a beneficial interest in the funds, the *Munford* majority concluded the bank "was not a 'transferee' in the LBO transaction." Id. Instead, the majority reasoned that the payments were really made "by Munford to shareholders," and the bank merely acted as a conduit for the payments. Id. Thus, the majority concluded § 546(e) was inapplicable because the transaction did not involve an actual transfer of beneficial interest by or to the financial institution involved. Id. We agree with the Third Circuit, however, that the holding in *Munford* cannot be squared with § 546(e)'s plain language. *In re Resorts, Int'l, Inc.*, 181 F.3d at 516 * * * . By its terms, § 546(e) protects settlement payments "made by or to a . . . financial institution," and does not expressly require that the financial institution obtain a beneficial interest in the funds. * * * Similarly, it is undisputed that First National received the payments from CIH and then distributed the payments to the Frosts in exchange for their stock. Thus, the settlement payments at issue were first made to, and then by, a financial institution. Under a literal reading of the relevant statutory language, the payments satisfy both requirements necessary to invoke the protections of § 546(e).

564 F.3d at 987-88.

The *Contemporary Industries* court then addressed the argument made by the Plaintiff in this case — that a literal interpretation of "financial institution" would protect intermediaries who take on no risk, have no beneficial interest, and therefore have nothing at stake if the transaction were unwound:

9

Where statutory language is plain and does not lead to an absurd result, we must enforce it as written. There is no reason to depart from that rule here. For the reasons discussed, the relevant text is not reasonably susceptible to the interpretation advanced by CIC — rather, the text plainly and unambiguously encompasses these payments. Moreover, that plain language does not lead to an absurd result in this case. CIC disagrees and contends it is unreasonable to construe § 546(e) as exempting these payments, the reversal of which would in no way impact the stability of the financial markets, solely because the parties utilized a financial institution as an escrow agent to complete the transaction. CIC argues that although it would have been unreasonable to expect the parties to assemble $ 26.5 million in cash for the closing, the payments would fall outside the exemption's scope if they had done so. We see no absurdity in that result. Indeed, particularly because so much money is at stake, we question CIC's assertion that the reversal of the payments--at least a portion of which were probably reinvested--would in no way impact the nation's financial markets. At the very least, we can see how Congress might have believed undoing similar transactions could impact those markets, and why Congress might have thought it prudent to extend protection to payments such as these. * * * In sum, this is not one of those "rare cases [in which] the literal application of a statute will produce a result demonstrably at odds with the intentions of its drafters," *Ron Pair Enters.*, 489 U.S. at 242 (alteration in original)    (quotation omitted), and the plain language therefore controls. Applying that language, we conclude the payments made to the Frosts in exchange for their Contemporary Industries stock are exempt from avoidance in bankruptcy as "settlement payment[s] . . . made by or to a . . . financial institution."

Id. See also *In re QSI Holdings, Inc.*, *supra*, 571 F.3d at 550 ("the plain language of § 546(e) simply does not require a 'financial institution' to have a 'beneficial interest' in the transferred funds.").

The predominant view in the Circuits — that "financial institution" means what it says and covers financial institutions even when they act only as a conduit for a settlement payment — is cogent and persuasive. The better authority requires a finding that BONY acted as a "financial institution" in the purchase of PlusFunds shares.

———————————

Accordingly, the Special Master recommends that the Plaintiff's claims in Counts 1 and 3 be dismissed with prejudice. The safe harbor of Section 546(e) applies to the purchase of PlusFunds shares because the purchase involved a settlement payment to and by a financial institution. Therefore "the trustee may not avoid" the transfer where avoidance is sought under Section 548(a)(1)(B) (Count 1) or Section 544 (Count 3).

The dismissal should be with prejudice as it is on purely legal grounds — accepting all facts asserted by the Plaintiff about the transaction as true, the purchase of PlusFunds shares involves a settlement payment to and by a financial institution under Section 546(e).

### *II. Count 2 — Claim to Avoid an Actual Fraudulent Transfer*

The parties agree that in order to survive a motion to dismiss on Count 2 — the claim that the transaction must be avoided because it was an actual fraudulent transfer under Section 548(a)(1)(A) — the Plaintiff must plead the following:

1. The Plaintiff must be prosecuting the avoidance claim for the benefit of at least one legitimate creditor.

2. The transferred funds must have been property of Suffolk's estate — put another way, Suffolk cannot have been a mere conduit for Refco's purchase of PlusFunds shares.

3. The purchase of PlusFunds must have been a *fraudulent* transaction.

The Bank Defendants argue that the Plaintiff has not sufficiently pleaded the facts to support any of these requirements.

The legal standard for evaluating a pleading on a motion to dismiss is as follows:

1) The Plaintiff need not establish that he will ultimately prevail. The question is whether the Plaintiff is entitled to obtain discovery and offer evidence to support his claim. *Triestman v. Fed. Bureau of Prisons*, 470 f.3d 471, 476 (2d Cir. 2006).

2) "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, 'to state a claim for relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1949, quoting *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 570 (2007). If the Plaintiff has not "nudged [his] claims across the line from conceivable to plausible, [his] complaint must be dismissed." *Twombly,* 550 U.S. at 547.

3) Claims of fraud must be "stated with particularity." Fed. R. Civ. P. 9(b)."The purpose of Rule 9(b) is to protect the defending party's reputation, to discourage meritless accusations, and to provide detailed notice of fraud claims to defending parties." *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1128 (2d Cir.1994). The Plaintiff must specifically describe the acts alleged to be fraudulent and provide some factual basis that creates a plausible inference of fraudulent intent. *See generally Sharp Int'l Corp. v. State Street Bank and Trust Co., (In re Sharp Int'l Corp.),* 403 F.3d 43, 56 (2d Cir. 2005) (finding the details and purposes of an alleged fraudulent transfer to be inadequately pleaded). The Second Circuit has found that an inference of fraudulent intent "may be established either (a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *Shields v. Citytrust Bancorp., Inc.,* 25 F.3d 1124, 1128 (2d Cir. 1994).

11

4) Under Rule 9(b), "[m]alice, intent, knowledge, and other condition of mind of a person may be averred generally."

5) The particularity requirements of Rule 9(b) are relaxed somewhat for fraud claims brought by trustees, because trustees cannot be expected to have personal knowledge of the underlying events. *Silverman v. H.I.L. Assoc., (In re Allou Distributors, Inc.),* 387 B.R. 365, 385 (Bankr. E.D.N.Y. 2008) ("A more liberal standard has been applied to fraud allegations in bankruptcy cases [because] it is often the trustee, a third party, who is pleading fraud on secondhand information.").

6) Leave to amend should be liberally granted — especially if the complaint has never been amended. Fed. R. Civ. P. 15(b). *See ATSI Communications, Inc. v. Shaar Fund, Ltd.,* 493 F.3d 87, 108 (2d Cir. 2007) (giving the plaintiff "at least one opportunity to plead fraud with more specificity.").

Applying these legal standards, the Special Master concludes that the Plaintiff has not alleged facts from which one could plausibly conclude that 1) the Plaintiff represents a legitimate creditor or that 2) Suffolk operated as anything more than a conduit. The question of whether the Plaintiff has sufficiently pleaded that the transaction for PlusFunds shares was fraudulent is close. But at any rate the pleading comes close enough on each of these points that the Plaintiff should be given leave to amend. What follows is a discussion of the pleading as it relates to each of the three requirements for recovery on the fraud claim.

### A. Legitimate Creditor

The Plaintiff must have standing to bring the avoidance claims in this case.[7] The Second

---

[7] Standing is of course needed for *all* the counts. But as will be seen below, standing involves questions of fact as to which the Plaintiff should be allowed leave to amend the complaint. In contrast, the claims for constructive fraud and fraudulent conveyance under state law are properly dismissed *with prejudice* because of the safe harbor for settlements that applies to those counts. Therefore, the discussion of standing is most important as a practical matter for the claim of actual fraud under Count 2.

The Bank Defendants argue that standing is lacking for the state law claims (Counts 3 and 4) under the *Wagoner* rule — a rule of New York law providing that a trustee lacks standing to assert "a claim against a third party for defrauding a corporation with the cooperation of management" on behalf of "the guilty corporation." *Shearson Lehman Hutton, Inc. v. Wagoner,* 944 F.2d 114, 120 (2d Cir. 1991). But as to Count 3, the courts have held that the *Wagoner* rule is not applicable to avoidance actions. See, e.g., *In re MarkeXT Holdings Corp.,* 376 B.R. 390, 423 (Bankr. S.D.N.Y. 2007) (stating broadly that "avoidance actions do not fall within the *Wagoner* rule."). The Bank Defendants argue that the inapplicability of *Wagoner* to avoidance

Circuit has stated that a bankruptcy trustee's standing

> coincides with the scope of the powers the Bankruptcy Code gives a trustee, that is, if a trustee has no power to assert a claim because it is not one belonging to the bankrupt estate, then he also fails to meet the prudential limitation that the legal rights asserted must be his own.

*Shearson Lehman Hutton Inc. v. Wagoner,* 944 F.2d 114, 118 (2d Cir. 1991).

The avoidance power of a trustee depends on whether there is a legitimate creditor to take advantage of the recovery. "[I]t is well settled in the Second Circuit, that avoiding powers may be exercised by a debtor in possession only for the benefit of creditors, and not for the benefit of the debtor itself." *In re Liggett,* 118 B.R. 219, 222 (Bankr. S.D.N.Y. 1990).

While a legitimate creditor is required to establish standing, the requirement is not especially exacting. A single legitimate creditor is sufficient to "trigger" standing. *See MC Asset Recovery, LLC v. Southern Co.,* 2006 U.S. Dist. LEXIS 97034 at *18 (N.D. Ga. Dec. 11, 2006) ("[I]n order to maintain an avoidance action * * * a trustee must demonstrate the existence of a so-called 'golden' or 'triggering' creditor: (1) an unsecured creditor, (2) who holds an allowable unsecured claim"). When a trustee establishes the existence of a triggering creditor, the trustee may seek to avoid a fraudulent transfer "not only for the benefit of that creditor, but also for the benefit of all of the unsecured creditors of the estate."*Silverman v. Sound Around, Inc. (In re Allou Distribs.),* 392 B.R. 24 (Bankr. E.D.N.Y. 2008). The amount of the triggering creditor's interest is irrelevant. COLLIER ON BANKRUPTCY P 544.09[5] (15th ed. rev. 2007) (a single triggering creditor provides a trustee with standing, and that standing is "not dependent at all upon the size of that creditor's claim against the debtor" because "an entire transfer can be set aside even though the creditor's claim is nominal.").

The parties dispute whether the Plaintiff has pleaded facts establishing a plausible claim that there is a legitimate creditor of the Suffolk estate. It is fair to state that the Complaint is thin on factual information supporting the existence of a triggering creditor. The only references to creditors of Suffolk in the complaint are the following:

1. Paragraph 11 states that Refco Capital is "Suffolk's only known, non-contingent,

---

claims is dependent on a showing that there is a legitimate third party creditor who stands to gain from any recovery by the debtor or trustee. But that argument just circles back to whether there is a legitimate creditor in this case — the matter discussed in the text of this section. Thus, *Wagoner's* applicability or inapplicability to the state law avoidance count does not, by the Bank Defendant's own argument, add anything to the "triggering creditor" analysis discussed in text.

The *Wagoner* rule might serve to dispose of Count 4, for unjust enrichment under New York law. But the Plaintiff has abandoned that Count.

liquidated creditor * * * ."

2. Paragraph 40 states that the purchase of PlusFunds shares "vitiated essentially all of the assets of Suffolk available to creditors by stripping Suffolk of virtually all property available for execution and distribution."

3. Paragraph 42 asserts that the purchase of PlusFunds shares "was part of an on-going scheme to defraud creditors of Suffolk."

It is most difficult to find a triggering creditor from the above assertions. It is true that the Plaintiff is not required to identify specifically the triggering creditor. *See In re Leonard*, 125 F.3d 543, 544 (7th Cir. 1997) ("Barker and Lieblich complain that the Trustee has not articulated the specific creditor who could set aside [the transfer] but a trustee need not do so. Thirteen unsecured claims have been filed; the Trustee can assume the position of any one of them."). But the Plaintiff must at least provide facts from which it can be plausibly concluded that there is at least one legitimate creditor of the estate. Possible legitimate creditors are discussed in turn.

### 1. Refco as a Legitimate Creditor

The only creditor specifically identified in the Complaint is Refco. But Refco is not a legitimate creditor because it was an active party to the fraud alleged in the complaint. The Plaintiff argues strenuously that Refco may be a legitimate creditor, and that any inference to the contrary is found in other complaints and determinations, so that "Refco Capital's knowledge of the challenged transaction are based on unproven facts not found in the Trustee's Complaint."[8] But the Plaintiff's own Complaint belies any claim that Refco is a legitimate creditor of the Suffolk estate. The Complaint states the following:

1) Suffolk was created for the purpose of purchasing PlusFunds shares and was thinly capitalized. Complaint ¶ 30 and 31.

2) Suffolk's principal asset was a Refco letter of credit, which Suffolk drew upon to facilitate the purchase of PlusFunds shares. Complaint ¶ ¶ 8 and 31.

3) PlusFunds shares were of little or no value. Complaint ¶ 33.

4) Suffolk rendered itself insolvent by using the Refco funds to purchase the PlusFunds shares. Complaint ¶ 34.

5) Other actions in the MDL have alleged that PlusFunds placed SPhinX assets at risk and that those assets "were used to fund the loan to Suffolk so that Refco could 'buy out' the

---

[8] Memorandum of Law in Response to Defendant's Motion to Dismiss the Complaint 12-13.

14

Suffolk Insiders' interests in PlusFunds for far more than those interests were worth." Those allegations "and their factual substantiation, are highly relevant to this action." ¶ 17.

Any realistic assessment of the inferences raised by the above paragraphs leads to the conclusion that Refco was heavily involved in structuring the transaction for the purchase of PlusFunds shares. It is easily inferred that Refco knew about Suffolk's financial situation, given that Suffolk's main asset was a Refco letter of credit. Refco's intimate involvement in the transaction for assertedly worthless shares is more than enough to disqualify Refco as a legitimate creditor of the Suffolk estate. Moreover, the oblique reference to the allegations in related cases, while perhaps not an incorporation of all of the assertions in those other complaints, can at least be considered an implicit assertion that Refco was engaged in fraud in arranging the PlusFunds transaction.

Finally, paragraphs 8 and 31 of the Complaint specifically reference the credit agreement between Refco and Suffolk. The terms of that credit agreement may therefore be considered on a motion to dismiss. *Cortec Industries, Inc. v. Sum Holding L.P.*, 949 F.2d 42 (2d Cir. 1991). *See also Yak v. Brussels Lambert,* 252 F.3d 127 (2d Cir. 2001) (document referred to in the complaint and in the possession of the plaintiff may be considered on a motion to dismiss). The Credit Agreement provides that the funds from Refco could be used only for the purchase of PlusFunds shares, and could only be disbursed with the permission of Refco.[9] Refco was thus intimately involved with and voluntarily participated in what the Plaintiff readily asserts was a fraudulent transaction.

Given the reasonable inferences to be drawn from the Plaintiff's own Complaint, it would be wasteful and it would blink reality to allow the action to proceed on the ground that the Plaintiff might be able to prove that Refco is a legitimate creditor of the Suffolk estate that had nothing to do with the purchase of PlusFunds shares. Therefore, Refco cannot be the triggering creditor, because it was a material participant in the alleged fraudulent transaction. *See HSBC Bank USA, N.A. v. Adelphia Communications Corp.,* 2009 WL 385474, at *6-7 (W.D.N.Y. Feb. 12, 2009) (fraudulent transfers not voidable where the benefit would run to a creditor that ratified the transfer).

### 2. Other Unsecured Creditors

The Plaintiff relies on the "publicly available claims register and Schedules, each of which demonstrate other [than Refco] purported creditors of the Suffolk estate."[10] The claims register indicates that a claim was filed by SphynX. The Schedules list the IRS and SEC as holding unsecured priority claims. The Schedules list Gibson Dunn & Crutcher and the Corporation Services Company as general unsecured creditors. At this point, SPhynX is the only creditor other than Refco to file a proof of claim.

---

[9] See Firsenbaum Decl. Ex. B to Bank Defendant's Motion to Dismiss §2.3.

[10] Memorandum of Law in Opposition to Defendants' Motion to Dismiss the Complaint 10.

*a. SPhynX*

Nothing in the Complaint purports to explain the basis for SPhynX's claim as a creditor of the Suffolk estate, or even mentions SPhynX as being a creditor — though one cannot expect too much from the Trustee at this point because the claim is not the Trustee's but that of SPhynX, and this was an involuntary petition.

The Bank Defendants argue that SPhynX. cannot be a legitimate triggering creditor because 1) it has already been determined — by Judge Drain in the Refco bankruptcy proceedings — that the claims of SPhynX lack merit; 2) SphynX, like Refco, was involved in and ratified the fraudulent transaction; and 3) SPhynX is pursuing its claim for harm caused by the Suffolk loans in another action in this MDL.[11]

The fact that common issues are being treated in other actions in this MDL does not justify dismissing this action on the pleadings for failure to establish SPhynX as a triggering creditor. If it comes to the point that 1) SPhynX is the only possible triggering creditor for the Suffolk estate and 2) it is established that the SPhynX claim arising from the Suffolk loans has no merit, then a motion to dismiss may be granted at that point.

Moreover, the Bank Defendants' argument that SPhynX was involved in and ratified the fraudulent transaction is not supported by the Plaintiff's pleading or by anything the Plaintiff has incorporated by reference. The only paragraphs of the Complaint that even refer to SPhynX are: 1) Paragraph 6, which simply describes PlusFunds as an investment advisor that offered investment vehicles to SphynX; and 2) Paragraph 17 — the paragraph with the oblique reference to other actions in the MDL — which simply states that there are allegations that *PlusFunds* and Refco victimized SPhynX by placing its assets at risk. These references in the Complaint do not in any way indicate that the Plaintiff has pleaded facts indicating that SPhynX was involved in the fraud or is somehow not a legitimate creditor.

This does not mean, however, that the Plaintiff has sufficiently pleaded a plausible case that SPhynX is in fact a legitimate creditor of the Suffolk estate. The Plaintiff has not alleged any facts in the Complaint that give any basis to conclude that SPhynX has a valid claim against the Suffolk estate. The mere filing of a claim cannot be enough to establish a legitimate triggering creditor. If that were so, then even claimants who ratified the transfer sought to be avoided, or who were prime actors in the fraud and so could never obtain a remedy, could be deemed triggering creditors providing standing for the Trustee. That is not the law. *Smith v. Am. Founders Fin. Corp.*, 365 B.R. 647, 659 (S.D.Tex. 2007) ("If the creditor is estopped or barred from recovery, so is the trustee.").

As stated above, the Complaint does not even mention that SPhynX is a creditor. But that does not mean that the Plaintiff could not plead facts indicating that SPhynX was a victim of fraud

---

[11] Reply Memorandum in Further Support of the Bank Defendants' Motion to Dismiss the Complaint. 8-10. The other actions referred to include *Krys v. Sugrue*, 08 Civ. 3086 (GEL).

with a legitimate claim against the Suffolk estate. Under the circumstances— and as discussed below — Plaintiff should be given an opportunity to set forth factual assertions and provide an explanation of why SPhynX would be a legitimate triggering creditor. If the pleading is amended, there will then be time enough to consider the impact of determinations made in related matters in this MDL.

### b. Unsecured Creditors That Have Not Filed a Proof of Claim

Purported creditors listed on the Schedules, who have not filed a proof of claim at this point, may or may not be legitimate triggering creditors. At oral argument on this motion, the parties worked their way through the Bankruptcy Code and addressed whether creditors need to file a proof of claim in order to be a triggering creditor with a valid claim against the estate, at the time of a motion to dismiss. The Plaintiffs rely on Section 726(a)(1) of the Bankruptcy Code, which provides that tardily filed *priority* claims will be paid out if "filed on or before the earlier of– (A) the date that is 10 days after the mailing to creditors of the summary of the trustee's final report; or (B) the date on which the trustee commences final distribution under this section." This section is, however, by its terms limited to priority claims. Claims that are not priority claims cannot be paid out unless timely filed or the claimant did not have knowledge or notice of the need to file, and the claim is filed in time to pay it. Section 726(a)(2).

The parties agree that any filing of a proof of claim made at this point will be "tardy" within the meaning mean of Section 726. Therefore, for any such claim to be "timely" filed at this point, it must either be a priority claim or one from a claimant who has an excuse of lack of notice or knowledge.

Applying the Code sections to the facts asserted in the Complaint raises a number of issues, such as:

1) is there a legitimate *priority* creditor, whose claim would not be barred under Section 726(a)1? The IRS and SEC are potential priority creditors, but there is no reference at all to either claim in the Complaint, and nothing but speculation about why these agencies have not filed a proof of claim.

2) Can some claimants on the schedule take advantage of the exception provided by Section 726(a)(2)?

3) Assuming that the claims could be timely filed, is there any factual indication that the claims may be legitimate?

To state these questions is to illustrate that they cannot be resolved in the Plaintiff's favor under *Twombley* and *Iqbal* when the Complaint that does not even mention any creditor other than Refco. Put another way, the Plaintiff has not made a plausible case that these creditors have legitimate claims against the Suffolk estate, because he has not pleaded any facts on that subject. The

In order to establish a triggering creditor for the group of those who have not filed a claim, the Plaintiff needs to plead in more detail his assertion that at least one of them has a legitimate claim and can still file it in a timely manner under the Bankruptcy Code. As discussed below, these detailed factual assertions should be the goal of an amended pleading.

## B. Suffolk as a Conduit for the Purchase of the PlusFunds Shares.

Even if there is a triggering creditor, the purchase of PlusFunds shares cannot be avoided unless it involved *property of the estate*. See Section 548(a) (the trustee "may avoid any transfer * * * of an interest of the debtor in property ***.").[12] Section 541(d) of the Bankruptcy Code provides that the debtor must have an "equitable interest" in property in order for it to become property of the estate. The legislative history of 11 U.S.C.A. § 541 indicates that funds in the debtor's possession held for a third party do not become part of the estate in bankruptcy:

> Situations occasionally arise where property ostensibly belonging to the debtor will actually not be property of the debtor, but will be held in trust for another. For example, if the debtor has incurred medical bills that were covered by insurance, and the insurance company had sent the payment of the bills to the debtor before the debtor had paid the bill for which the payment was reimbursement, the payment would actually be held in a constructive trust for the person to whom the bill was owed.

H.R.Rep. No. 595, 95th Cong., 1st Sess. 368 (1977); S.Rep. No. 989, 95th Cong., 2d Sess. 82 (1977), reprinted in 1978 U.S.Code Cong. & Admin.News 5787, 5868, 6324. *See also T&B Scottdale Contractors, Inc. v. United States,* 866 F.2d 1372, 1376 (11th Cir. 1989) (when the debtor held funds that, pursuant to contract, were to be paid out to certain individuals, the debtor was simply an intermediary and the funds were not property of the estate); *City of Springfield v. Ostrander (In re Lan Tamers, Inc.),* 329 F.3d 204, 210 (1st Cir. 2003) ("The plain text of § 541(d) excludes property from the estate where the bankrupt entity is only a delivery vehicle and lacks any equitable interest in the property it delivers. Identical language found in both the House and Senate reports that accompanied passage of the Bankruptcy Code strongly reinforces this plain reading.").

Courts have determined that an asset is property of the estate when the debtor had "control" over that property. *See Kapila v. Espirito Santo Bank (In re Bankest Capital Corp.),* 374 B.R. 333, 338 (Bankr. S.D.Fla. 2007) ("The dispositive question is whether the Debtor had control over the subject funds."). Determining "control" requires courts "to step back and evaluate a transaction in its entirety to make sure that their conclusions are logical and equitable." *Nordberg v. Societe*

---

[12] Count 3 seeks to avoid the transfer under Section 544 of the Bankruptcy Code. Section 544 provides that the "trustee * * * may avoid any transfer of *property of the debtor* * * * ." As discussed above, Counts 1 and 3 are more easily disposed of under the safe harbor of Section 546(e).

*Generale (In re Chase & Sanborn Corp.)*, 848 F.2d 1196, 1199 (11th Cir.1988). "Control" has two components:

> first, the power to designate which party will receive the funds; and, second, the power to actually disburse the funds at issue to that party. In other words, control means control over identifying the payee, and control over whether the payee will actually be paid.

*In re Safe-T-Brake of South Florida, Inc.,* 162 B.R. 359, 365 (Bankr.S.D.Fla.1993).

Some courts have applied the two-component test of control by asking whether the transaction primarily serves the interests of the debtor. *In re Bowers-Siemon Chemicals Co.,* 139 B.R. 436 (Bankr.N.D.Ill.1992). Where the debtor's interests do not animate the transaction, courts are more likely to find that there was no transfer of property of the debtor. *See Nordberg v. Sanchez, (In re Chase & Sanborn Corp.),* 813 F.2d 1177 (11th Cir. 1987) (funds were not property of the debtor where they were deposited in a bank account as a conduit to pay a personal debt of the president of the company); *In re Scanlon,* 239 F.3d 1195 (11th Cir.2001) (funds in an escrow account were not property of the estate where the funds were not to benefit the debtor, and the debtor could not direct who would receive the funds).

The Bank Defendants argue that the transaction for PlusFunds shares did not involve property of Suffolk, because Suffolk was nothing but a conduit for the transaction between Refco and the owners of the PlusFunds shares. They note that under the terms of the credit agreement between Refco and Suffolk, [13] Suffolk was permitted to use the proceeds of the Refco loan for only one purpose—to purchase PlusFunds shares. The Credit Agreement further provides that Suffolk could not engage in "any business activity other than the Transactions" to obtain the PlusFunds shares. Credit Agreement §7.2.1. Thus, Suffolk was essentially prohibited from doing any business other than buying the PlusFunds shares with the loan given by Refco. Id. §§ 7.2.1-11. The Credit Agreement further provides that Suffolk was required to deposit the loan funds into an escrow account with the Bank of New York, and those funds could not be disbursed to buy PlusFunds shares unless both Refco and Suffolk approved. The shares were then pledged to Refco to secure the loan. Credit Agreement §§ 2.3, 5.1.5, 5.1.8, 5.2.4. From all this the Bank Defendants conclude that "Suffolk was not permitted to retain Refco Capital's loans for its own use, and therefore the funds transferred from Refco Capital to the Bank Defendants did not constitute property of Suffolk."[14]

The Plaintiff does not deny the legal principle that if Suffolk were operating as a mere

---

[13] See §7.1.6 of the Credit Agreement, Firsenbaum Decl. Ex. B. As discussed above, the credit agreement is referenced in the Plaintiff's complaint and may be considered on these motions to dismiss.

[14] Memorandum of Law in Support of the Bank Defendants' Motion to Dismiss the Complaint 25.

conduit, then the funds used to purchase the PlusFunds shares were not Suffolk's property and the transaction could not be avoided. The Plaintiff contends, however, that Suffolk was more than a pass-through. The Plaintiff states that the transfer made to the Bank Defendants "deeply affected Suffolk's estate"; that Refco never exercised its call right or acquired the PlusFunds shares from Suffolk; and that the shares are still held by Suffolk. From this the Plaintiff concludes that Suffolk was the owner of the funds lent by Refco and owned the shares once they were purchased with those funds.[15]

Many of the plausible inferences that can be drawn from the Complaint would indicate that Suffolk was not a real player in the purchase of PlusFunds shares. As recounted previously, the Complaint avers that Suffolk's sole purpose was to facilitate the purchase of PlusFunds shares, and that its principal asset was the Refco letter of credit, from which it drew for the purchase of PlusFunds shares. These facts make Suffolk look like a paper intermediary. In the words of the cases on control, it would appear from the Complaint that the transaction did not primarily serve the interests of the debtor. *In re Bowers-Siemon Chemicals Co., supra.* The fact that Suffolk still has the PlusFunds shares in its custody is not dispositive — by the Plaintiff's own admission, the shares are worthless. Custody over worthless pieces of paper says little or nothing about whether the custodian had control over the transaction.

On the other hand, the Plaintiff does allege that the PlusFunds purchase rendered Suffolk insolvent — which is not the ordinary consequence one would expect from a debtor that acted solely as a pass-through.[16]

The Credit Agreement, which both parties cite, cuts both ways. From the Bank Defendants' perspective, the Credit Agreement could be read to cede most of the control over the transaction to Refco. And in the words of the cases on control, Suffolk appears not to have had "the power to designate which party will receive the funds." *In re Safe-T-Brake of South Florida, Inc., supra* On the other hand, as the Bank Defendants admit, the funds could not be disbursed unless *both* Suffolk and Refco signed off on the transaction. Thus the agreement indicates that Suffolk at least had *some*

---

[15] Memorandum of Law in Response to Defendants' Motion to Dismiss the Complaint 19-24.

[16] The pass-through cases, cited above, usually involve a fact situation different from that presented in this case: there are assets assertedly within the bankrupt estate, and a party brings an adversary proceeding to have the assets distributed on the ground that the estate is just a stakeholder and so the assets are not property of the estate. See, e.g., *In re Scanlon*, 239 F.3d 1195 (11th Cir.2001) (funds in an escrow account maintained by the debtor). An exception is *In re Cannon*, 277 F.3d 838 (6th Cir. 2002), where the lawyer-debtor stole money from client escrow accounts. The court held that the funds in the escrow accounts were not property of the estate because they were maintained for the benefit of the clients. *Cannon* is distinguishable from the facts of this case as well, however, because the trustee in that case could not argue that the transactions resulted in a negative impact on the estate --- as the Plaintiff can do here.

control over the transaction. *See Georgia Pacific Corp. v. Sigma Serv. Corp.*, 712 F.2d 962 (5th Cir.1983) (checks in debtor's possession made payable jointly to claimant and debtor held part of debtor's estate because no clear bilateral agreement stated that checks belonged to claimant).[17]

The control cases require the court to evaluate a transaction in its entirety. *Nordberg v. Societe Generale (In re Chase & Sanborn Corp.), supra.* The problem is that the allegations in the Plaintiff's Complaint are too thin to draw a firm conclusion about the transaction in its entirety. How did the transaction actually operate — in strict accordance with the Credit Agreement? What was the day-to-day relationship, if any, between Suffolk and Refco? What would have happened if Suffolk (or Refco, for that matter) had refused to sign off on the disbursement of funds? Why didn't Refco exercise a call on the PlusFunds shares? These are questions on which one could speculate — and questions on which other actions in the MDL may shed some light — but there is not enough in the spare allegations of the Complaint to support a plausible conclusion that Suffolk had *real* control over the assets used to purchase PlusFunds shares.

One might argue that the only way to evaluate the transaction in its entirety is to go to discovery. But the Court in *Twombley* cautions courts to make certain that the pleadings are sufficiently detailed to assure that defendants are notified and the costs of discovery are not unnecessarily imposed. 550 U.S. at 558-60. Given the fact that Count 2 should be repleaded on the question of whether there is a triggering creditor (see *supra*), it makes sense to require repleading as well on the question of whether Suffolk had control over the assets that are the subject of the avoidance claim.[18]

### C. Was the Transaction Fraudulent?

The Bank Defendants claim that the Plaintiff's fraud claim is not pleaded with the particularity required by Fed. R. Civ. P. 9(b).[19] As discussed above, the particularity requirement

---

[17] Notably, though, the control test has been construed to mean "control over identifying the payee, *and* control over whether the payee will actually be paid." *In re Safe-T-Brake of South Florida, Inc.*, 162 B.R. 359, 365 (Bankr.S.D.Fla.1993) (emphasis added).

[18] Of course the court does not *require* a pleading to be amended. It *permits* it. But the reference to a requirement is that unless the Plaintiff provides a more detailed factual assertion of Suffolk's role in the transaction, there will not be enough from which to plausibly infer that it had control over the funds used to purchase the PlusFunds shares.

[19] The argument of insufficient pleading of fraud applies to Counts 2 and 3, and not to Count 1, which is a claim for constructive fraud, *see Eclaire Advisor Ltd. v. Daewoo Eng. & Constr. Co., Ltd.,* 375 F.Supp.2d 257, 267 (S.D.N.Y. 2005) (Rakoff, J.). . But as discussed above, the claims in Counts 1 and 3 should be dismissed in any event because of the safe harbor for settlement payments. Therefore the discussion in text focuses on the allegations in Count 2.

of Federal Rule 9(b) is relaxed somewhat when the fraud claim is asserted by a bankruptcy trustee because the trustee was not involved in the underlying transaction. But the Bank Defendants contend that even under a relaxed standard, Count 2 is wanting for at least two reasons: 1) The Plaintiff's fraud complaint is little more than conclusory assertions that essentially track the statute; and 2) The Plaintiff has not sufficiently pleaded Suffolk's fraudulent intent because there is no allegation that there was an intent to defraud a *creditor*.[20] These arguments will be taken in turn.

### 1. Conclusory Assertions of Fraud:

It is fair to state that the factual assertions supporting a claim of fraud in the Complaint are spare. For example, Paragraph 56 simply says that "the Defendant and/or Suffolk acted with intent to hinder, delay, or defraud present and/or future creditors of Suffolk as a result of the Fraudulent Transfer." Even given the relaxed requirements for trustees, and even given Rule 9(b)'s proviso that a person's state of mind may be alleged generally, there is not much to go on in that paragraph. Essentially it tracks Section 548(a)(1)(A).

Subsequent paragraphs are somewhat more helpful. Paragraph 58 states that the purchase of PlusFunds amounted to a payment of all the assets of Suffolk in exchange for a worthless asset. That was a bad deal for Suffolk. While it does not necessarily mean that fraud was afoot, it at least raises an inference in that direction.

Paragraph 59 states that the transfer "ultimately benefited the Suffolk Insiders, who were shareholders of Plus Funds." This allegation raises a possibility of fraud, but its lack of detail is troubling. Similarly, Paragraph 60, which describes the Stock Purchase Agreement as a cashing out scheme "for the exclusive benefit of the Suffolk Insiders" raises an inference of fraud, but is troublingly vague.

The Plaintiff argues that he has pleaded "badges of fraud" — circumstantial evidence from which fraud can plausibly be concluded. As set forth in *In re Le Cafe Creme, Ltd.*, 244 B.R. 221, 239 (Bankr.S.D.N.Y.,2000), the following factors have been found to be badges of fraud:

(1) the lack or inadequacy of consideration; (2) the family, friendship or close associate

---

[20] As to the *state* fraud claims, the Bank Defendants claim that the Plaintiff must — and did not — sufficiently plead the fraudulent intent of each Bank Defendant. That argument does not apply to Count 2, as the Bank Defendants admit that Section 548 of the Bankruptcy Code "focuses exclusively on the transferor's intent." Memorandum of Law in Support of the Bank Defendants' Motion to Dismiss the Complaint 33. As discussed above, the state law fraud claim should be dismissed because of the protection for settlement payments provided by Section 546(e). Therefore it is unnecessary to wade through and resolve the conflicting case law on whether transferee intent must be proven under New York DCL §276. *See Bayou Accredited Fund, LLC v. Redwood Growth Partners, L.P. (In re Bayou Group LLC)* 396 B.R. 810, 826-7 (Bankr. S.D.N.Y. 2008) (citing conflicting case law).

relationship between the parties; (3) the retention of possession, benefit or use of the property in question; (4) the financial condition of the party sought to be charged both before and after the transaction in question; (5) the existence or cumulative effect of a pattern or series of transactions or course of conduct after the incurring of debt, onset of financial difficulties, or pendency or threat of suits by creditors; and (6) the general chronology of the events and transactions under inquiry.

Other relevant indicia of fraud are: (i) a transfer for no consideration when the transferor and the transferee know of the claims of creditors and know that creditors cannot be paid and (ii) a vast discrepancy between the value of the property transferred and the consideration received for it. *Breeden v. Bennett (In re The Bennett Funding Group, Inc.)*, 220 B.R. 743, 755 (Bankr.N.D.N.Y.1997). *See also In re Kaiser*, 722 F.2d 1574, 1582 (2d Cir. 1983) (finding transfer of property to be fraudulent where it was made by a debtor to a family member while the debtor was insolvent; the family relationship and the debtor's financial condition of the debtor indicated badges of fraud).

The Plaintiff has a fair argument that the allegations in the complaint, while undetailed, do raise a couple of badges of fraud. For example, the Complaint raises inferences of a close relationship among the actors, and a vast discrepancy between the value of the property transferred and the consideration received for it. But the case law does not establish that, for example, asserting two (or three, etc.) badges of fraud are enough to survive a motion to dismiss. Rather, the badges are simply circumstantial evidence of fraud, and the Plaintiff has pleaded some relevant circumstances. Moreover, the Second Circuit requires a strong showing of circumstantial evidence for a successfully pleaded fraud claim. *Shields v. Citytrust Bancorp., Inc.,* 25 F.3d 1124, 1128 (2d Cir. 1994). It is questionable whether the Plaintiff's allegations of circumstantial evidence reach that level.

Ultimately it is a close question whether the Plaintiff has sufficiently pleaded a fraudulent transaction. But because leave to amend should be granted on the questions of the existence of a triggering creditor and on whether the funds sought were property of the estate, *see supra*, it makes sense to instruct the Plaintiff that it if he does decide to amend, he should also provide more detailed assertions on his claim that the transaction was fraudulent.

### 2. Intent to Defraud a Creditor

The Bank Defendants argue that the fraud claim must be dismissed because Section 548(a)(1)(A) requires that the trustee show that the transfer was made "with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date that such transfer was made or such obligation was incurred, *indebted.*" Thus, the Plaintiff must show that there is a legitimate creditor of the Suffolk estate in order to establish a claim of fraud. *See also Nisselson v. Softbank AM Corp. (In re MarketXT Holdings Corp.),* 361 B.R. 369, 395 (Bankr. S.D.N.Y. 2007) (act of fraud must result in loss to a creditor).

23

The "defraud a creditor" argument is a rerun of the "triggering creditor" argument discussed in Section II A, albeit in a different context. If the Plaintiff, should he decide to amend, makes a plausible claim that there is a legitimate creditor of the Suffolk estate — and thus establishes standing as discussed in Section II A — then he will also have met the "creditor" requirement for a proper pleading of the fraud claim.

### *III. Leave to Amend Count 2*

As discussed above:

• the Plaintiff has not provided enough in the Complaint for a plausible inference that a legitimate creditor exists to confer standing (and thereby to create a plausible inference that there was an intent to defraud a *creditor*);

• the Plaintiff has not provided enough information about the purchase of the PlusFunds shares, the operation of the Credit Agreement, and the working relationship between Refco and Suffolk to establish that the funds were controlled by Suffolk and so became property of the Suffolk estate; and

• the Plaintiff should provide more explicit and specific factual assertions concerning the PlusFunds transaction to create a stronger inference that Suffolk had fraudulent intent.

Because the pleading on Count 2 raises a series of close and difficult questions, the Plaintiff should be allowed leave to amend. Judge Lynch's analysis in *Kirschner v. Bennett*, 2009 WL 2601375 at *15 (S.D.N.Y., August 25, 2009) is applicable here:

Rule 15(a) of the Federal Rules of Civil Procedure provides that leave to replead should be "freely given when justice so requires." Fed.R.Civ.P. 15(a). Leave to replead may be denied if repleading would be futile, *Acito v. IMCERA Group, Inc.*, 47 F.3d 47, 55 (2d Cir.1995), but it is far from clear that repleading would be futile here. The complaint in this action was filed * * * prior to a number of other developments in related cases that may allow all parties to benefit from repleading. * * * [T]he Trustee deserves "at least one opportunity to plead fraud with greater specificity." *ATSI Comme'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 108 (2d Cir.2007). One such opportunity will be afforded.

Judge Lynch added a proviso in footnote 27 that is also applicable here:

That leave to replead is granted does not indicate that repleading is encouraged, or suggest that an amended complaint is likely to state a cause of action. It merely reflects that the Court, necessarily ignorant of the facts that plaintiff might be able to allege, cannot conclude that repleading is necessarily futile.

24

### *IV. Recommendations*

In accordance with the report above, the Special Master recommends the following with respect to the motions to dismiss by the Bank Defendants:

1. The motions to dismiss Count 1 of each Complaint should be *granted with prejudice*, because the transaction that the Plaintiff seeks to avoid was a settlement payment to and by a financial institution, and therefore is not subject to avoidance under 11 U.S.C. §546(e).

2. The motions to dismiss Count 2 of each Complaint should be *granted with leave to amend* on the questions of

a. whether there is a legitimate creditor of the Suffolk estate (and thus a potentially defrauded creditor);

b. whether Suffolk controlled the funds used to purchase the PlusFunds shares and thus was not merely a conduit for the transaction; and

c. whether purchase of the PlusFunds shares was a fraudulent transaction.

3. The motions to dismiss Count 3 of each Complaint should be *granted with prejudice*, because the transaction that the Plaintiff seeks to avoid was a settlement payment to and by a financial institution, and therefore is not subject to avoidance under 11 U.S.C. §546(e).

4. The motions to dismiss Count 4 of each Complaint must be *granted with prejudice* as that Count has been abandoned by the Plaintiff.

Daniel J. Capra
Special Master

Dated: November 13, 2009
New York, New York

25